745 F.2d 967
 36 Fair Empl.Prac.Cas. 330,
35 Empl. Prac. Dec. P 34,756
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff-Appellee,
Avis M. Cook, Plaintiff-Intervenor,
v.
EXXON SHIPPING COMPANY, Defendant-Appellant.
 No. 84-2169
 
 Summary Calendar.
 United States Court of Appeals,
Fifth Circuit.
 Nov. 5, 1984.
 Melinda Furche Harmon, J. Kevin French, Houston, Tex., for defendant-appellant.
 Dianna B. Johnston, E.E.O.C., Washington, D.C., for E.E.O.C.
 Gordon R. Cooper, II, Houston, Tex., for Cook.
 Appeal from the United States District Court for the Southern District of Texas.
 Before RUBIN, RANDALL and TATE, Circuit Judges.
 RANDALL, Circuit Judge:
 
 
 1
 Exxon Shipping Company appeals from the judgment in this Title VII disparate treatment case in which the district court, 583 F.Supp. 632, found that plaintiff-intervenor, Avis Cook, was discriminatorily denied a promotion to the position of Transportation Allocator. The district court awarded backpay, increased annuity payments and attorneys' fees. This appeal attacks the court's finding of discrimination and its determination that the accrual of backpay was not tolled by the unconditional offer of a comparable job. For the reasons set forth below, we affirm.I. PROCEDURAL AND FACTUAL BACKGROUND.
 
 
 2
 Avis Cook ("Cook"), a woman, worked for the Marine Department of Exxon Corporation ("Exxon")[1] for approximately fifteen years as a secretary. Throughout much of that period, she aspired to move up the Exxon ladder into jobs with higher pay and greater responsibilities. In 1978 and 1979, Cook's department at Exxon was reorganized and many personnel changes occurred, which, Cook felt, created vacancies in higher positions for which she was qualified. Although promotions were discussed with her, the positions desired by Cook were ultimately filled by men. On June 21, 1979, Cook filed a charge of sex-based discrimination against Exxon with the Equal Employment Opportunity Commission ("EEOC"). Conciliation efforts failed and the EEOC filed a Title VII, 42 U.S.C. Sec. 2000e, suit against Exxon in the district court. Cook intervened in the suit and was represented throughout trial by her own counsel.
 
 
 3
 Cook was employed at Exxon's Baytown office, which is responsible for providing field support for Exxon's marine activities. Throughout the period relevant to this lawsuit, the work at Baytown fell into one of two roughly defined categories: (1) "Inland" work, which dealt primarily with Exxon's marine activities along the intercoastal waterway and (2) "Agency" work, which dealt primarily with sea-going vessels making port calls in the Texas area. To handle this work, Exxon employed persons in a job classification entitled "Transportation Allocator." Transportation Allocators ("TAs") were assigned either to Agency work or Inland work.
 
 
 4
 Agency TAs were responsible for administering to the needs of sea-going vessels docking in the area and for minimizing the amount of time these vessels spent in port. Agency TA duties included: (1) arranging for tug boats and personnel; (2) ordering goods and services needed by the vessel's seamen; (3) replenishing the vessel's provisions; and (4) preparing and filing documentation required by various government agencies. Inland TAs, on the other hand, coordinated the activities of Exxon tugs and barges used to deliver fuel sales to customer-vessels in the intercoastal waterway. Inland TA duties included: (1) confirming sale orders; (2) issuing loading and discharge orders; (3) ensuring that deliveries were made; and (4) transmitting billing information through proper channels. The Inland position was primarily a desk job. The Agency TAs, on the other hand, spent some of their time out of the office, boarding ships and dealing with government officials.
 
 
 5
 It is undisputed that Cook desired a promotion to a TA position. It is also undisputed that Exxon considered Cook qualified for such a position. The parties do dispute, however, whether, through a complicated series of personnel changes, Exxon deprived Cook of a TA position because of her sex. Cook testified that, before Exxon implemented its alleged discriminatory scheme, she would have accepted either an Inland or an Agency TA position and that she might have even preferred an Inland slot. Her pleadings, however, complain only of a failure to promote her to an Agency slot. Indeed, the district court found that she was discriminatorily denied an Agency slot in May or June of 1979.
 
 
 6
 The circumstances surrounding the failure to promote Cook are somewhat complicated. A summary of the fact findings underpinning the district court's ultimate finding of intentional discrimination follows. Traditionally, Agency and Inland TAs at Baytown worked Monday through Friday and rotated weekend responsibilities. In late 1978, Exxon reorganized the Baytown operation by reducing the number of Inland TAs to two and by increasing the number of Agency TAs. As part of this plan, Exxon determined that the least experienced Inland TA should work every weekend, on a Thursday to Monday shift, while the senior Inland TA should work Monday to Friday, with weekends off.[2] Agency TAs would, however, continue to rotate weekend work.
 
 
 7
 In November of 1978, Cook's supervisor, Craig Rassinier ("Rassinier"), informed her that, as a result of this shake-up, two Agency TA slots might be opening up. Ultimately, only one position became available when Tom Brown ("Brown") refused a transfer from Inland to Agency and elected to retire. At about the same time, however, W.A. Scott ("Scott"), an Agency TA, went on extended medical leave, but indicated that he would like to return to his duties, if possible, in about six month's time. In the interim, Scott's duties were performed by Billy Hopper ("Hopper"), who was hired on a contract basis. At this time, Cook was not offered either the Brown or the Scott Agency TA position. Instead, she was offered an Inland TA position in December of 1978 which became available when Stringer resigned. She refused the job because, as the junior TA in the reorganized Inland section, she would be required to work every weekend. The reasons for the switch from rotating weekends were not explained to Cook, and she was left with the impression that weekend work would be a permanent requirement if she accepted the job. The vacancy was filled by Frank Sylvia ("Sylvia"), a transfer from the marketing department, who was told that the weekend assignment would last only until the lead Inland TA position became available.
 
 
 8
 Thereafter, in March of 1979, Hopper was hired as a permanent employee, purportedly to fill the Agency position that Brown had refused. The position was not filled earlier because Brown delayed his retirement by taking accrued vacation time. While working on a contract basis, however, Hopper had been doing Scott's work and he apparently continued to do so after his permanent employment began. Sometime after March of 1979, Scott informed Exxon that, although he would like to return to work, his health prevented him from resuming his Agency TA duties. Rather than force Scott into medical retirement, Exxon engineered a job swap: Scott was transferred to Houston into a job held by Ignatio Hurtado ("Hurtado") and, at least on paper, Hurtado came to Baytown to fill Scott's Agency TA slot. Since Hopper was already performing Scott's job, however, Hurtado actually filled the vacancy created by Brown's retirement. At about the same time, Brentzel resigned as lead Inland TA. Sylvia was taken off weekend duty, and the back up Inland TA job was again offered to Cook. Cook again turned the job down.
 
 
 9
 The district court found that, during this time frame, two Agency TA positions became available: the position filled by Hopper and the position filled by Hurtado. The court also found that, although Hopper may have been better qualified for an Agency TA position than Cook, Cook was discriminatorily denied the position filled by Hurtado. The district court further found that Exxon's offer of the back up Inland TA position to Cook in May of 1979 did not toll the accrual of backpay for the denial of an Agency position because the jobs are not comparable and because the job was offered to Cook as part of Exxon's ongoing, discriminatory scheme to keep women out of Agency positions.
 
 
 10
 II. CONTENTIONS ON APPEAL.
 
 
 11
 Exxon argues on appeal that the district court erred (1) by finding that Exxon intentionally discriminated against Cook and (2) by misapplying the Supreme Court's decision in Ford Motor Co. v. EEOC, 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982), to the backpay issue. As to liability, Exxon claims that the court misallocated the burden of proof and held Exxon to the standard appropriate in disparate impact cases, not disparate treatment cases. As to damages, Exxon claims that the court erroneously determined that Exxon did not toll backpay liability by offering Cook the back up Inland TA position because the offer did not include retroactive seniority. With respect to both damages and liability, Exxon claims that the court's ultimate determinations are undermined by several clearly erroneous fact determinations.
 
 
 12
 Cook, in a brief filed by the EEOC, claims that Exxon's legal arguments are spawned by a mischaracterization of the record and the district court's opinion and that the ultimate findings of liability and damages are amply supported by the record.
 
 
 13
 III. LIABILITY ISSUES.
 
 
 14
 A. The Burden of Proof in Disparate Treatment Cases.
 
 
 15
 The burden of proof in a Title VII disparate treatment case is clear beyond question: the plaintiff must prove that the defendant intentionally discriminated against her. U.S. Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). To facilitate the inquiry into intentional discrimination, the Supreme Court has outlined a framework for the orderly presentation and evaluation of the evidence: (1) plaintiff establishes a prima facie case,[3] which raises a rebuttable presumption of unlawful discrimination; (2) defendant must then rebut the presumption by articulating, not proving, a legitimate, nondiscriminatory reason for the employment decision; and (3) if defendant does so, the presumption drops from the case and plaintiff is left with the ultimate burden of proving discrimination (by showing either that the defendant's proffered reason is unbelievable or that the defendant was more likely than not motivated by a discriminatory reason). Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Whatever importance this framework has below, see Fed.R.Civ.P. 41(b), by the time a fully-tried case reaches us on appeal, the parties' showing at the preliminary levels of the framework is largely irrelevant. Aikens, 460 U.S. at 715, 103 S.Ct. at 1481. We need address only the propriety of the ultimate finding of discrimination vel non. Id.
 
 
 16
 The district court found that Cook established a prima facie case and that she successfully demonstrated that Exxon's proffered reasons for failing to promote her were a pretext for discrimination. Record Vol. I at 31. In short, there can be no doubt that, at least on paper, the district court correctly allocated the ultimate burden of proof to Cook and held that she successfully discharged it. Id.
 
 
 17
 Exxon argues that, in reality, the district court imposed on Exxon the burden of demonstrating that, in accommodating Scott's medical problems, "it did the best it could" for Cook. In effect, Exxon continues, the district court applied the Title VII analysis appropriate to disparate impact cases, not disparate treatment cases.[4]
 
 
 18
 We think Exxon's argument is a clever attempt to evade the clearly erroneous standard of review. Exxon tried the case on the theory that sex played no role in the decision to swap Hurtado's job for Scott's: Exxon simply applied its sex-neutral policy (the "lateral transfer policy") of transferring disabled employees to new jobs rather than retiring them. According to this policy, a disabled employee is not forced to retire if a job he can perform is located and if the employee in that job can be transferred to the disabled employee's position. The swap can only occur, however, if both positions are on roughly the same level in the job hierarchy and if the swap will not result in any additions or subtractions from the payroll. Exxon argued that it simply applied this policy when flip-flopping Hurtado and Scott; Cook was not considered for Scott's position because (1) Scott could not be transferred to her position without suffering a demotion and (2) placing Cook in Scott's position would add another exempt employee to the payroll and create a secretarial vacancy. Instead, Hurtado was transferred to Scott's position because, within the constraints of the policy, he was the best qualified person with whom a swap could be arranged.
 
 
 19
 Exxon draws its argument that the district court applied the wrong legal analysis to this case from certain language in the district court's findings and conclusions. While discussing the Scott-Hurtado exchange, the court noted that "[m]anagement's explanation that this move was the best Exxon could do is unacceptable to this court." Record Vol. I at 32. The court went on to discuss various alternatives that, in the court's view, Exxon could have employed to accommodate both Scott's medical problems and Cook's desire for a promotion to a TA position.[5]
 
 
 20
 Exxon argues that, by mentioning alternatives to the Scott-Hurtado exchange, the court lost sight of the true inquiry: whether Exxon intentionally discriminated against Cook. Reliance on alternatives to the lateral transfer policy that, in the court's view, would have a lesser impact on Cook suggests to Exxon that the court engaged in an adverse impact analysis of the sex-neutral lateral transfer policy. This was error, according to Exxon, because (1) the case was not presented as an adverse impact case and (2) the existence of alternatives to the Scott-Hurtado exchange "is not dispositive" of the issue of intentional discrimination.
 
 
 21
 Exxon further argues that, by these statements, the court was requiring Exxon to show that it had done its best to promote Cook. Exxon points out that it is under no obligation to "do its best" to accommodate its employees' desires for promotion; it simply cannot refuse to promote them for impermissible reasons. As a result of the court's misallocation of the burden of proof, Exxon argues, Exxon was held liable simply because the court disagreed with the lateral transfer policy. The court should have, according to Exxon, focused on whether the lateral transfer policy which resulted in the Hurtado-Scott switch "was utilized by Exxon in order to discriminate against Cook." Appellant's Brief at 20.
 
 
 22
 We think that is exactly what the court determined. We refuse to imply from isolated language in the court's findings and conclusions that it applied an erroneous standard. Considered as a whole, the findings and conclusions reveal that the court correctly allocated the burden of proof and made findings sufficient to support its judgment: (1) the court noted that Cook had the burden to prove intentional discrimination, Record Vol. I at 31; (2) the court found that Exxon's profferred reason for the refusal to promote was a pretext for discrimination, id. and (3) ultimately, the court found that Exxon intentionally discriminated against Cook because of her sex. Id. at 33. There is nothing in the court's findings and conclusions to convince us that the district court imposed upon Exxon any burden other than the burden of articulating a nondiscriminatory reason for failing to promote Cook. The court's discussion of the available alternatives to the Scott-Hurtado exchange does not indicate to us that it applied an erroneous legal standard: the court was simply summarizing personnel changes that the evidence showed could have been implemented but for the lateral transfer policy. On the liability issue, we are left, then, with Exxon's attack on the court's fact findings.
 
 
 23
 B. Are The Liability Fact Findings Clearly Erroneous?
 
 
 24
 Exxon argues that, in determining that Cook was the victim of intentional discrimination, the district court made three clearly erroneous factual determinations: (1) that Hurtado was unqualified for an Agency TA position; (2) that there was a vacant Agency TA position at the Baytown office in June of 1979; and (3) that there were alternatives to the Scott-Hurtado exchange.
 
 
 25
 1. Hurtado's Qualifications.
 
 
 26
 The district court found that Hurtado had no experience as a TA, that he lacked one of the job's minimum requirements and that Cook was "eminently more qualified for the Agency TA position than was Mr. Hurtado." Record Vol. I at 29. We cannot characterize these findings as clearly erroneous.
 
 
 27
 Exxon argues that the district court found that Hurtado had no qualifications for the Agency TA position and that such a finding is clearly erroneous. Exxon mischaracterizes the court's findings. At the damage phase of the trial, the court did state from the bench that Hurtado had "no qualifications for that job." Record Vol. VII at 5. At various points in its findings and conclusions the court also notes that Hurtado was "not qualified at all" for an Agency TA position. Record Vol. I at 32.
 
 
 28
 We note at the outset that, to the extent the court's statements from the bench conflict with its formal findings and conclusions, we do not consider them. See C. Wright & A. Miller, Federal Practice & Procedure: Civil Sec. 2580 (1971). At any rate, the inclusion of an erroneous finding that Hurtado had no qualifications for the job would not be material.[6] We think that the gravamen of the court's finding is simply that Hurtado was far less qualified than Cook for an Agency TA position. That finding is not clearly erroneous.
 
 
 29
 The district court apparently based this conclusion, in part, on a review of Exxon performance appraisals of Hurtado from which the court concluded that Hurtado lacked interpersonal skills. We share Exxon's concern with respect to the validity of this conclusion.[7] We think, however, that the record nonetheless clearly supports the conclusion that Cook was more qualified for a TA position than Hurtado.
 
 
 30
 Prior to the transfer, Hurtado had never performed Agency or Inland TA duties or worked in the Marine Department at Baytown. Record Vol. IV at 195 (testimony of Ernest McNeil). The testimony was overwhelming that Cook, on the other hand, had been performing most, if not all, Agency duties on an occasional basis, while TAs were on vacation or in need of assistance, since the late 1960s. E.g., Record Vol. III at 23. In fact, the Exxon witnesses who testified at trial did not assert that Hurtado was more qualified than Cook, but simply that the lateral transfer policy was a legitimate reason for favoring Hurtado over Cook.
 
 
 31
 2. Vacancy in the Agency Section.
 
 
 32
 Exxon next argues that Cook's promotion claim must fail if no vacancy existed in the position she desired. See Teamsters v. United States, 431 U.S. 324, 358 n. 44, 97 S.Ct. at 1866 n. 44 (1977) ("absence of vacancy in the job sought" is legitimate reason to deny position). The court's finding, Exxon continues, that Scott's inability to continue his Agency duties created a vacancy to which Cook might have been promoted is clearly erroneous. It is erroneous because, under the lateral transfer policy, Exxon could only fill Scott's position with an exempt employee on Scott's level: the policy precluded Exxon from accommodating Scott's condition in any fashion that would result in additions or subtractions from the payroll or the elevation of a non-exempt employee to exempt status.
 
 
 33
 The district court found that an Agency TA vacancy opened up in December 1978 when Brown refused the transfer from Inland to Agency. The court stated that that vacancy remained available until June 1, 1979, when Hurtado was transferred from Houston.[8] Record Vol. I at 27. Exxon argues that there was only one Agency TA vacancy, which was caused by Brown's retirement; Scott's medical retirement did not create a vacancy in the traditional sense because his job could only be filled within the narrow limits of the lateral transfer policy.
 
 
 34
 We think that the district court's finding is supported by the evidence. It is clear that two new persons undertook Agency duties during this period. The court's statement that Brown's Agency position remained vacant from December to June is based on the court's finding that Hopper, although nominally hired first on a contract basis and then as a permanent employee to replace Brown, actually performed Scott's duties. See Record Vol. I at 24, 26 ("Hopper was hired on a contract basis to fill Mr. Brown's spot in Agency, but was assigned to perform Mr. Scott's duties") ("Hurtado's transfer was supposed to replace Mr. Scott, however, he performed Mr. Brown's duties because Mr. Hopper was already performing Mr. Scott's job"). Under this view of the evidence, which we cannot say is clearly erroneous, see Part B, 4, infra, Brown's position did in fact remain open until Hurtado was transferred to fill it in June of 1979. Since Scott's duties were actually filled by Hopper, who was not a lateral transfer, there was a vacancy in June which did not implicate the lateral transfer policy.
 
 
 35
 3. Alternatives to the Scott-Hurtado Exchange.
 
 
 36
 Exxon argues that the district court made additional clearly erroneous fact findings when it listed alternatives to the Scott-Hurtado exchange that Exxon could have utilized to accommodate both Cook and Scott. Exxon argues that the alternatives were not, in fact, available because they conflicted with the requirements of the lateral transfer policy. This argument ignores the fact that the court determined that the lateral transfer policy was invoked specifically to discriminate against Cook. Since the court determined that the transfer policy was a pretext for discrimination, it would serve no purpose to test the cited alternatives against the policy. The evidence supports the conclusion that, but for the policy, the alternatives cited by the court were available to Exxon. See Part B, 4, infra.
 
 
 37
 We turn, then, to an analysis of the ultimate finding that the transfer was a pretext and that Exxon discriminated against Cook.
 
 
 38
 4. The Ultimate Finding of Discrimination.
 
 
 39
 As an initial matter, Exxon argues that, in response to evidence of a legitimate reason for failing to promote Cook, Cook failed entirely to offer countervailing evidence that the lateral transfer policy was not the real reason for Exxon's decision. We agree with Exxon that pretext cannot be established by mere "conclusory statements" of a plaintiff who feels he has been discriminated against. Elliott v. Group Medical & Surgical Serv., 714 F.2d 556, 566 (5th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 2658, 81 L.Ed.2d 364 (1984). We find, however, sufficient evidence to support the conclusion that Exxon was more likely than not motivated by a discriminatory reason.
 
 
 40
 Giving due regard to the trial court's opportunity to judge the credibility of the witnesses, we summarize the evidence supporting the court's conclusion. Prior to Cook's charge of discrimination, there were no women Agency TAs at the Baytown facility. When Cook was initially informed by Rassinier about the possibility of the Brown Agency position, she was told to discuss with her husband whether he would approve of her accepting a job which required the boarding of ships at night. Record Vol. III at 43-46 (testimony of Avis Cook). When she did not get that position, Rassinier informed her that there were people in Houston who "did not know" about having a woman Agency TA. Id. Vol. IV at 55-57 (testimony of Craig Rassinier). Rassinier testified that "several sources" had expressed concern about a woman holding an Agency TA position. Id. When Scott informed Exxon that he could not resume his Agency duties, Exxon invoked the lateral transfer policy to fill his position; his duties were already being performed by Hopper, however, who continued to perform Scott's duties after the lateral transfer. Id. Vol. III at 38 (testimony of Avis Cook); id. Vol. IV at 145-46 (testimony of David Lunceford); id. at 80 (testimony of Craig Rassinier). Although Rassinier generally participated in TA personnel decisions at Baytown, he was not consulted when Hurtado was transferred to his department. Id. at 78 (testimony of Craig Rassinier). Although Hurtado may have possessed the minimum qualifications for the job, Cook was far more experienced, having worked in the Marine Department and performed most if not all of the Agency TA duties on a relief basis for years. Id. Vol. III at 23 (testimony of Avis Cook); id. at 138 (testimony of Donald L. Kerr). In fact, Exxon witnesses admitted that Hurtado was not transferred to Baytown because he was more qualified than Cook, but simply because of the requirements of the lateral transfer policy. Id. at 66 (testimony of Craig Rassinier); id. Vol. IV at 156 (testimony of David Lunceford); id. at 203 (testimony of Ernest McNeil). But for the lateral transfer policy, Cook could have been promoted to Agency TA when Scott determined that he was unable to resume his duties. Id. at 189-91 (testimony of Ernest McNeil).
 
 
 41
 Based on this evidence, we cannot say that the district court's finding of intentional discrimination is clearly erroneous. We note that Exxon has apparently adopted some admirable procedures, such as its program for identifying secretaries with the qualifications for promotion, to provide opportunities for its employees. We cannot, however, overturn the district court's determination in face of the evidence that Exxon (1) did not want women in the Agency TA position; (2) filled a vacant Agency TA position with a male when a qualified and experienced woman in the department desired the position; and (3) justified the move by reference to a policy that, because Scott's position had effectively been filled by Hopper, did not apply to the situation. In short, there is sufficient evidence to support the district court's conclusion that Exxon had unofficially filled Scott's position with Hopper but, when faced with the possibility of promoting a woman to an Agency position, invoked the lateral transfer policy to replace Scott officially, thereby giving Exxon an excuse for not elevating Cook to fill the Agency vacancy.
 
 
 42
 IV. BACKPAY ISSUES.
 
 
 43
 The district court awarded Cook $25,000.00 in backpay--the additional salary the parties stipulated that she would have received had she been promoted to an Agency TA position on June 1, 1979. Exxon argued vigorously below that, under Ford Motor Co. v. EEOC, 458 U.S. at 219, 102 S.Ct. at 3057, the accrual of backpay was tolled when Cook refused the offer of the Inland vacancy created by Brentzel's retirement.
 
 
 44
 The district court considered Ford Motor Co., but held it inapplicable for several reasons: (1) Inland and Agency jobs are not comparable; (2) the job offered to Cook was more onerous than the job she desired; (3) Exxon offered Cook the Inland job, believing that she would not accept it, as part of its continuing scheme of discrimination; and (4) Cook was offered the Inland job before she was discriminatorily denied the Agency job.
 
 
 45
 Before addressing Exxon's specific arguments, we wish to place the Ford Motor Co. decision in its proper context, as we understand it. Section 706(g) of Title VII, 42 U.S.C. Sec. 2000e-5(g), gives courts the discretion to award backpay as a remedy for intentional discrimination. It expressly incorporates, however, the "ancient principle" of the law of damages, 458 U.S. at 231, 102 S.Ct. at 3065, that an injured claimant must use reasonable diligence to cut his losses: "Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the backpay otherwise allowable." 42 U.S.C. Sec. 2000e-5(g).
 
 
 46
 Ford Motor Co. deals with a very narrow issue and does not modify the general principles of damage mitigation that have been developed under Title VII and the National Labor Relations Act, 29 U.S.C. Sec. 160(c): since a claimant must exercise reasonable diligence to minimize damages, he forfeits his right to backpay if he refuses a job substantially equivalent to the one he was discriminatorily denied. Id. at 232, 102 S.Ct. at 3065. Of course, a Title VII claimant may voluntarily accept employment that is not substantially equivalent and any sums actually earned thereby will reduce the employer's liability for backpay. Id. at 231 n. 14, 102 S.Ct. at 3065 n. 14. The duty to minimize damages, however, does not obligate the employee to accept a position that " 'is not consonant with his particular skills, background, and experience' or 'which involves conditions that are substantially more onerous than his previous position.' " Id. at 231 n. 16, 102 S.Ct. at 3065 n. 16 (quoting NLRB v. Madison Courier, Inc., 472 F.2d 1307 (D.C.Cir.1972)).
 
 
 47
 We think that the cases decided both before and after Ford Motor Co. establish that the central question with respect to damage mitigation is for the trier of fact: what amount could the employee have earned through the exercise of reasonable diligence? See, e.g., Marks v. Prattco, Inc., 633 F.2d 1122, 1125 (5th Cir.1981) ("finding[s] that both plaintiffs had exercised reasonable diligence in seeking employment following their wrongful termination ... are findings of fact, which we review subject to the 'clearly erroneous' standard of Fed.R.Civ.P. 52(a)"). Cf. Parson v. Kaiser Aluminum & Chemical Corp., 727 F.2d 473, 478 (5th Cir.) (decision when to terminate backpay liability is fact determination, subject to clearly erroneous standard), cert. denied, --- U.S. ----, 104 S.Ct. 3516, 82 L.Ed.2d 824 (1984). If the employee has refused the offer of a specific job, whether from defendant or another employer, the question is basically the same: was the employee's refusal of the job reasonable? See, e.g., Williams v. Albemarle City, 508 F.2d 1242 (4th Cir.1974) (en banc).
 
 
 48
 In this context, the Court in Ford Motor Co. recognized that an employer can toll the accrual of backpay liability "by unconditionally offering the claimant the job he sought [or one substantially equivalent], and thereby providing him with an opportunity to minimize damages." Id. at 232, 102 S.Ct. at 3065. We do not think that Ford Motor Co. changes the rule that where, as here, the employer offers a job other than the specific job which the employee sought, the questions of substantial equivalence and the reasonableness of the refusal of the job are for the trier of fact. See, e.g., Rasimas v. Michigan Dept. of Mental Health, 714 F.2d 614, 623 (6th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 2151, 60 L.Ed.2d 537 (1984). Cf. NLRB v. Laredo Packing Co., 730 F.2d 405, 408 (5th Cir.1984) (NLRA case); Spagnuolo v. Whirlpool Corp., 717 F.2d 114 (4th Cir.1983) (ADEA suit).
 
 
 49
 The specific holding of Ford Motor Co. is that an employer can toll the accrual of backpay by offering the claimant the job originally sought, even without an offer of seniority retroactive to the date of discrimination. In other words, an employer does not have to offer the claimant the seniority rights that he would have earned between the original discrimination and the curative job offer; compensation for seniority rights can await determination by a court. With this background, we turn to an examination of Exxon's specific claims.
 
 
 50
 A. Retroactive Seniority.
 
 
 51
 Exxon argues first that the district court refused to halt the running of backpay on the date Cook was offered the Inland job because the Inland offer did not include retroactive seniority. This argument lacks merit. Exxon argues that (1) Cook refused the Inland job, which refusal the court found reasonable, because it would have required her to work every weekend; (2) the weekend requirement is a function of seniority in the sense that the more senior Inland TA is automatically assigned the Monday through Friday shift; and (3) therefore, upholding Cook's decision to refuse the job because of the weekend requirement means, in effect, that Exxon could only have tolled backpay by offering Cook an Inland job with retroactive seniority.
 
 
 52
 We disagree. This case simply does not involve a retroactive seniority issue. Ford Motor Co. deals with an attempt to toll backpay liability by the offer of the job previously denied. The Court simply held that an employer may successfully do so even without offering the employee the seniority rights that would have been earned from the date of discrimination until the date of the job offer. In this case, Exxon wants to toll backpay liability by offering Cook a different job--a job with a more onerous schedule. The fact that scheduling in that job is a function of seniority in that job is irrelevant for our purposes. As noted, Ford Motor Co. deals with seniority rights from the date of the discrimination to the date of the job offer. Here, Exxon offered Cook the Inland job within days of its decision to discriminatorily deny her the Agency job. The seniority rights she would have earned during this very short time period would not have given her the right to the Monday through Friday Inland shift because Sylvia had been an Inland TA for at least three months.
 
 
 53
 B. Comparable Jobs.
 
 
 54
 The district court found that Cook was not unreasonable in turning down the Inland job. As noted, this is a fact determination. We cannot say that it is clearly erroneous. Exxon argues that the Inland and Agency jobs are comparable because (1) the pay is the same; (2) Cook was qualified for the Inland job and testified that she might have even preferred it over an Agency position; and (3) Cook did not refuse the job because of its weekend requirement, but because she felt that her seniority entitled her to the lead Inland job.
 
 
 55
 The testimony was undisputed that, although the pay was the same, Agency and Inland duties were very different. See, e.g., Record Vol. IV at 101 (testimony of David Lunceford) ("So it is a completely different kind of work. They are not even--if you really get down to it, they are not even close to being related as far as activity is concerned."). It is equally undisputed, however, that Cook was qualified for either job and, if the scheduling requirements were similar, she would have accepted either. See, e.g., Record Vol. III at 57-58 (testimony of Avis Cook) ("And it wouldn't have made any difference to me whether it was an Inland or Agency as long as the working conditions were, you know, equal."). Therefore, if the district court's finding was bottomed on the different duties required of Inland and Agency TAs, we might have difficulty in upholding the finding that Cook reasonably refused the Inland job offer.
 
 
 56
 The court's conclusion, however, is also based on the finding, which is undisputed, that Cook was offered a position that would require her to work every weekend. Based on this finding, we cannot say that the court's determination of reasonableness is clearly erroneous, although we acknowledge that the issue is a close one. It is clear that the terms and conditions of employment, including the hours and days an employee is required to work, are relevant factors that inform the inquiry into job equivalence and the reasonableness of the refusal of a job offer. See, e.g., Rasimas, 714 F.2d at 624 (substantial equivalence inquiry extends to "promotional opportunities, compensation, job responsibilities, working conditions, and status"); Stone v. D.A. & S. Oil Well Serv., 624 F.2d 142, 144 (10th Cir.1980) (upholding finding that part-time job is not substantial equivalent of full time job); McCann Steel Co. v. NLRB, 570 F.2d 652, 655 (6th Cir.1978) (NLRA case) (substantially equivalent employment "refers to the hours worked ... as well as the nature of the work there"); NLRB v. Madison Courier, Inc., 472 F.2d 1307, 1320 (D.C.Cir.1972) (NLRA case) (must accept substantially equivalent employment, not employment "which involves conditions that are substantially more onerous"); Donovan v. Commercial Sewing, Inc., 562 F.Supp. 548, 555 (D.Conn.1982) (full time job not substantial equivalent of part-time job). Since Cook was performing a job that did not require weekend work and was qualified for and discriminatorily denied a job that required only occasional weekend work, we are not persuaded to overturn the district court's decision that she acted reasonably in turning down a job that required her to work every weekend.
 
 
 57
 Exxon argues that Cook testified that she would have accepted the Inland job offered to her in December of 1978 if she had been informed of the possibility of moving out of weekend work if the lead Inland slot became vacant. It follows, Exxon argues, that Cook was unreasonable in refusing the same job offered to her in May when she was informed of the possibility of getting out of weekend work. We disagree. We cannot characterize the district court's finding that Cook was reasonable as clearly erroneous simply because Cook had testified that she would have accepted the job when offered it at an earlier point in time. Cook was wrongfully denied a position with limited weekend requirements and offered a job which required work every weekend; we cannot say she was unreasonable in refusing the job.
 
 
 58
 V. CONCLUSION.
 
 
 59
 We find no merit in Exxon's legal arguments and are unable to sustain its claims that the district court made clearly erroneous fact findings. Therefore, we affirm.
 
 
 60
 AFFIRMED.
 
 
 
 [1]
 In 1982, after suit was filed, the work of the Marine Department was transferred to a newly formed corporation, Exxon Shipping Company. Just prior to trial, Exxon Shipping Company was substituted as the proper defendant in this action. This corporate reorganization has no bearing on the issues raised on this appeal and will be ignored
 
 
 [2]
 The reorganization left Mark Brentzel ("Brentzel") and Philip Stringer ("Stringer") as the only two Inland TAs. Since Brentzel had the most experience, he was assigned the Monday through Friday slot (the "lead" position) and Stringer was required to work every weekend (the "back up" position). The district court found that the change from rotating weekends to a fixed schedule in the Inland section was not made "solely to dissuade Mrs. Cook from accepting the promotion." Record Vol. I at 33. In fact, Exxon witnesses testified that the change was made to reduce customer complaints: foul ups would be reduced if the more experienced TA worked during the week and arranged schedules which could then be implemented by the junior TA on the weekend. Apparently, Exxon contemplated that, whatever personnel changes occurred in the Inland section, the more experienced Inland TA would always be assigned the Monday through Friday shift. Therefore, a backup Inland TA could expect to be relieved of weekend duty if and when the lead TA position became available through resignation, promotion or otherwise
 
 
 [3]
 With respect to a promotion claim, plaintiff's prima facie case consists of proof that (1) plaintiff is a member of a protected class; (2) she applied for a promotion to an available position for which she was qualified; (3) she did not receive the promotion; and (4) the employer filled the position with an employee from outside the protected class or continued to seek applicants for the position. See, e.g., Page v. U.S. Industries, Inc., 726 F.2d 1038, 1055 (5th Cir.1984); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973)
 
 
 [4]
 In a disparate impact case, unlike disparate treatment cases, the plaintiff is not required to prove a discriminatory motive. Teamsters v. United States, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). Rather, plaintiff must prove that a neutral employment practice, that is not justified by business necessity, has an adverse impact on a protected group. See, e.g., Dothard v. Rawlinson, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977)
 
 
 [5]
 The court suggests, for example, that Cook could have been promoted to Agency TA and Scott moved to the lead Inland position vacated by Brentzel. Alternatively, Scott could have been transferred to Houston, Hurtado placed in Brentzel's slot and Cook promoted to Agency TA
 
 
 [6]
 We agree with Exxon that it would be inaccurate to assert that Hurtado had no qualifications for the TA position. Ernest McNeil ("McNeil"), a retired Exxon administrative manager, testified that, although there is no minimum educational requirement, a TA must (1) be able to read and write reasonably well; (2) have basic mathematical skills; (3) be relatively calm and possess the ability to juggle many tasks at one time; and (4) possess interpersonal skills. Record Vol. IV at 193. Rassinier testified that he is not familiar with minimum requirements for the job (other than walking and breathing) but that it would be preferrable if a candidate for the position had knowledge of the maritime industry. Record Vol. IV at 55
 Based on this undisputed testimony, we agree with Exxon that it is inaccurate to assert that Hurtado had "no qualifications" for a TA position; presumably he could breathe, walk and read. In addition, there is testimony that he possessed a general knowledge of the marine industry and was, in fact, basically qualified for the job. Record Vol. IV at 185.
 
 
 [7]
 Our review of the exhibits reveals only two performance appraisals which question Hurtado's interpersonal skills: A June 1971 report, Defendant's Exhibit C-28 ("communications needs improvement and exercise more tact with fellow employee") and a June 1972 report, Defendant's Exhibit C-26 ("appears to be a 'lone wolf' should attempt to become one of the group"). Both of these appraisals, however, reported his "Job Relationships" as "moderately high." In fact, later appraisals praise his interpersonal skills. E.g., 1977-1978 Appraisal and Developmental Summary, Defendant's Exhibit C-7 (lists interpersonal skills as "strength"; rates interpersonal skills "high"). A post-transfer review, Defendant's Exhibit C-5, rates interpersonal skills as "normal" with the notation that Hurtado is a possible introvert. His interpersonal skills were also noted to be a negative influence on promotability and an area for improvement. A 1980 evaluation expresses similar concerns about his interpersonal skills, Defendant's Exhibit C-3. These later appraisals were, of course, not available to Exxon at the time of the transfer
 
 
 [8]
 The court later in its findings and conclusions stated that "at least one Agency position was available from December 1978 through March 1979, and then again from May 1979 through June 1, 1979." Record Vol. I at 31. Exxon argues that, as an initial matter, this finding may be inconsistent with the finding that the Brown position remained open from December until June. We think the court's reference to a December-March and a separate May-June vacancy is not necessarily inconsistent with this view of the evidence. This finding is included with the conclusions of law and can plausibly be read, we think, as a summary of Exxon's position with respect to the lateral transfer. Immediately after this statement, the court notes that "management says [Cook was not considered for the May-June vacancy] because it was a lateral transfer of two employees to accommodate Mr. Scott's health problems." Record Vol. I at 15